# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-1844

_____

State of North Dakota

*Petitioner*

v.

United States Environmental Protection Agency, and Lisa P. Jackson, Administrator

*Respondent*

Basin Electric Power Cooperative

*Intervenor*

_____

No. 12-1961

_____

Great River Energy

*Petitioner*

v.

United States Environmental Protection Agency, and Lisa P. Jackson, Administrator

*Respondent*

Basin Electric Power Cooperative

*Intervenor*

———————————————

No. 12-2331

———————————————

National Parks Conservation Association; Sierra Club

*Petitioner*s

v.

United States Environmental Protection Agency; Lisa P. Jackson, Administrator,
United States Environmental Protection Agency

*Respondent*s

Basin Electric Power Cooperative; Great River Energy; Minnkota Power
Cooperative; Square Butte Electric Cooperative; State of North Dakota

*Intervenor*s

------------------------------

Montana-Dakota Utilities Co., A Division of MDU Resources Group, Inc.;
Northern Municipal Power Agency; Northwestern Corporation, doing business as
NorthWestern Energy; Otter Tail Power Company

*Amici on Behalf of Respondent*

———————

Petition for Review of an Order of the
Environmental Protection Administration

———————

Submitted: May 14, 2013
Filed: September 23, 2013

———————

-2-

Before WOLLMAN, MURPHY, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

In these consolidated petitions for review, the State of North Dakota (State), Great River Energy, and National Parks Conservation Association and Sierra Club (collectively Environmental Groups) challenge the final rule promulgated by Environmental Protection Agency (EPA) on April 6, 2012, see 77 Fed. Reg. 20,894-945 (the Final Rule). The Final Rule approved in part and disapproved in part two state implementation plans (SIPs) submitted by the State to address its obligations under §§ 110 and 169A of the Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q, and promulgated a federal implementation plan (FIP) to address those portions of the SIPs that were disapproved. We grant in part and deny in part the State's and Great River Energy's petitions for review, and deny the Environmental Groups' petition for review and voluntary motion to dismiss under Federal Rule of Appellate Procedure 42(b).

## I. Background

### A. Statutory Background

"[I]n 1977, '[i]n response to a growing awareness that visibility was rapidly deteriorating in many places, such as wilderness areas and national parks,' Congress added § 169A to the [Clean Air Act.]" Am. Corn Growers Ass'n v. EPA, 291 F.3d 1, 3 (D.C. Cir. 2002) (per curiam) (second alteration in original) (internal citation omitted) (quoting Chevron U.S.A., Inc. v. EPA, 658 F.2d 271, 272 (5th Cir. 1981)). "Section 169A established as a national goal the 'prevention of any future, and the remedying of any existing, impairment in visibility in mandatory class I areas which

impairment results from manmade air pollution.'" Id. (quoting Clean Air Act Amendments of 1977, Pub. L. No. 95-95, § 128, 91 Stat. 685, 742 (current version at 42 U.S.C. § 7491(a)(1))). In connection with § 169A, "Congress directed EPA to issue regulations requiring states to submit [SIPs] containing emission limits, schedules of compliance, and other measures necessary to make reasonable progress toward meeting the national visibility goal." Id.

Under the regional haze regulations promulgated by EPA, a state "must establish goals (expressed in deciviews) that provide for reasonable progress towards achieving natural visibility conditions" in "each mandatory Class I Federal area located within the State[.]"[1] 40 C.F.R. § 51.308(d)(1). In reaching these reasonable progress goals, the state must consider "the cost of compliance, the time necessary for compliance, the energy and non-air quality environmental impacts of compliance, and the remaining useful life of any potentially affected sources, and include a demonstration showing how these factors were taken into consideration in selecting a goal." Id. § 51.308(d)(1)(i)(A). The state must also analyze and determine the rate of progress necessary to achieve natural visibility conditions in the mandatory Class I Federal areas by the year 2064 and "consider the uniform rate of improvement in visibility and the emission reduction measures needed to achieve it for the period

---

[1]"The deciview is an atmospheric haze index that expresses uniform changes in haziness in terms of common increments across the entire range of conditions, from pristine to extremely impaired environments. A one deciview change in haziness is a small but noticeable change in haziness under most circumstances when viewing scenes in mandatory Class I Federal areas." 62 Fed. Reg. 41,145 (internal footnote omitted). Areas designated as Class I Federal areas include all international parks, national wilderness areas which exceed 5,000 acres in size, national memorial parks which exceed 5,000 acres in size, and national parks which exceed 6,000 acres in size. 42 U.S.C. § 7472(a). "[T]he term 'mandatory class I Federal areas' means Federal areas which may not be designated as other than class I[.]" 42 U.S.C. § 7491(g)(5). There are two such areas in the State: Theodore Roosevelt National Park and Lostwood Wilderness Area.

covered by the implementation plan." Id. § 51.308(d)(1)(i)(B). If the state's reasonable progress goals provide for a slower rate of improvement than necessary to achieve natural visibility conditions by 2064, the state must demonstrate "that the rate of progress for the implementation plan to attain natural conditions by 2064 is not reasonable; and that the progress goal adopted by the State is reasonable." Id. § 51.308(d)(1)(ii).

In addition to the reasonable progress goals, § 169A and the regional haze regulations require states to determine the best available retrofit technology (BART) for certain major stationary sources built between 1962 and 1977 that are reasonably anticipated to cause or contribute to visibility impairment in any Class I area. See 42 U.S.C. § 7491(b)(2)(A); 40 C.F.R. §§ 51.301, 51.308(e). To address the requirements for BART, a state must submit a SIP that contains a list of all BART-eligible sources and an analysis that takes into consideration the technology available, the costs of compliance, the energy and non-air quality environmental impacts of compliance, any pollution control equipment in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology. Id. § 51.308(e)(1)(i)-(ii). For BART-eligible sources that have a total generating capacity greater than 750 megawatts, the state must also use Appendix Y to the BART Guidelines in making its determination. Id. § 51.308(e)(1)(B). Appendix Y creates a five-step process for determining BART on a case-by-case basis: (1) identify all available retrofit control technologies; (2) eliminate technically infeasible options; (3) evaluate control effectiveness of remaining control technologies; (4) evaluate impacts and document the results; and (5) evaluate visibility impacts. See 70 Fed. Reg. 39,164.

The CAA also "charges EPA with setting National Ambient Air Quality Standards, or NAAQS, which prescribe the maximum permissible levels of common pollutants in the ambient air." EME Homer City Generation, L.P. v. EPA, 696 F.3d 7, 12 (D.C. Cir. 2012). "The States implement the NAAQS within their borders

-5-

through . . . SIPs." Id. at 13. The CAA requires states to submit revised SIPs to address new or revised NAAQS within three years after promulgation of the NAAQS. 42 U.S.C. § 7410(a)(1). Section 110(a)(2) identifies the required elements of a state's interstate transport SIP submission, which include what is known as the "good neighbor" provision. Id. § 7410(a)(2)(D). The good neighbor provision requires that a SIP contain four distinct components, one of which is a visibility component. Id. § 7410(a)(2)(D)(i)(II). The visibility component mandates that the SIP contain an adequate provision prohibiting any source of emissions within the state from emitting air pollutant in amounts that will interfere with measures required to be included in the applicable SIP for any other state to protect visibility. Id.

"Under the Clean Air Act, both the Federal Government and the States exercise responsibility for maintaining and improving air quality." Am. Trucking Ass'ns v. EPA, 600 F.3d 624, 625 (D.C. Cir. 2010). "The Act sets forth a basic division of labor: The Federal Government establishes air quality standards, but States have primary responsibility for attaining those standards within their borders." EME Homer, 696 F.3d at 29. "The Act thus leaves it to the individual States to determine, in the first instance, the particular restrictions that will be imposed on particular emitters within their borders." Id. at 12. But, if a state fails to submit a SIP, submits an incomplete SIP, or submits a SIP that does not meet the statutory requirements, EPA is obligated to implement its own FIP to correct the deficiency in the SIP, unless the State can correct the deficiency itself and EPA can approve that correction within two years. 42 U.S.C. § 7410(c). This is commonly referred to as cooperative federalism, and both § 169A and § 110 operate under this framework.

## B. Procedural Background

The State submitted its interstate transport SIP for EPA approval on April 6, 2009, and submitted its regional haze SIP on March 3, 2010. The State submitted a SIP Supplement No. 1 on July 27, 2010, and also a SIP Amendment No. 1 on July 28,

2011. EPA issued a proposed rule on September 21, 2011, see 76 Fed. Reg. 58,570-648 (Proposed Rule), proposing to disapprove the State's regional haze SIP regarding its determination of BART for the Coal Creek Station, Milton R. Young Station Units 1 and 2, and Leland Olds Station Unit 2, as well as the reasonable progress determination for the Antelope Valley Station Units 1 and 2, and to disapprove the State's interstate transport SIP for failure to satisfy the visibility component. Along with the proposed partial disapprovals, EPA proposed the promulgation of a FIP to address the deficiencies in the SIPs. See id. at 58,573-74.

After the public notice and comments period on the Proposed Rule was completed, EPA issued its Final Rule. See 77 Fed. Reg. 20,894-945. The Final Rule differed in one major respect from the Proposed Rule—although EPA had proposed to disapprove the State's BART determinations for Young Station Units 1 and 2 and Olds Station Unit 2, EPA instead decided to approve the State's BART determinations for those units. See 77 Fed. Reg. 20,897-98. This determination was based primarily on the decision in United States v. Minnkota Power Cooperative, Inc., 831 F. Supp. 2d 1109, 1127-30 (D.N.D. 2011), which concluded that the State's analysis of the best available control technology (BACT) for Young Station Units 1 and 2 was not unreasonable—a conclusion contrary to EPA's position at the time of EPA's Proposed Rule.

Because Minnkota was issued after the public notice and comments period had closed on EPA's Proposed Rule, interested parties were unable to comment on EPA's decision to rely upon it as persuasive authority for approving the State's BART determinations for Young Station Units 1 and 2 and Olds Station Unit 2. The Environmental Groups filed a petition for reconsideration with EPA on June 5, 2012, see 42 U.S.C. § 7607(d)(7)(B), voicing their concerns with EPA's reliance upon Minnkota and its subsequent approval of the State's BART determination for Young Station Units 1 and 2 and Olds Station Unit 2. The Environmental Groups moved to have their petition for review before this court held in abeyance until EPA determined

-7-

whether it would entertain the petition for reconsideration. The Environmental Groups' motion for abeyance was denied without prejudice on July 31, 2012. Thereafter, EPA granted the petition for reconsideration on November 19, 2012, and that reconsideration process is still ongoing. Following EPA's grant of the petition for reconsideration, the Environmental Groups moved under Federal Rule of Appellate Procedure 42(b) to voluntarily dismiss the instant petition for review concerning the BART determinations for Young Station Units 1 and 2 and Olds Station Unit 2. That motion is still pending before us.

## II. Discussion

### A. Standard of Review

We will set aside EPA's Final Rule if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 42 U.S.C. § 7607(d)(9). This standard is the same as that used under the Administrative Procedures Act, 5 U.S.C. § 706(2). See EME Homer, 696 F.3d at 23 n.17. But, "[o]nly an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B). This administrative exhaustion provision is strictly enforced, Natural Res. Def. Council v. EPA, 571 F.3d 1245, 1259 (D.C. Cir. 2009) (per curiam), "to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule." Appalachian Power Co. v. EPA (Appalachian Power I), 135 F.3d 791, 818 (D.C. Cir. 1998) (per curiam).

### B. Simultaneous Denial of a SIP and Promulgation of a FIP

The State first contends that the Final Rule should be vacated because EPA procedurally erred under the CAA by simultaneously disapproving the State's SIP

and promulgating its FIP in the same Final Rule. Under the CAA, reversal of an action because of procedural error is appropriate only when (1) the failure to observe the procedure is arbitrary or capricious; (2) the alleged error was raised during the comment period; and (3) the error was so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not been made. 42 U.S.C. § 7607(d)(9)(D).

Among other things, § 7607(d)(3) requires that a proposed rule under the CAA contain a statement of basis and purpose, which must include a summary of the factual data on which the proposed rule is based, the methodology used in obtaining the data and in analyzing the data, and the major legal interpretations and policy considerations underlying the proposed rule. The State argues that a proper statement of basis and purpose for EPA's FIP could not be issued until a final rulemaking on its SIP was issued. Even assuming that the State's interpretation of § 7607(d)(3) is correct, the State has failed to demonstrate that EPA's error in this regard was "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if the error had not been made." Id. at § 7607(d)(9)(D). Although "[i]t may be poor policy to try to distinguish between the SIP and FIP in a single action[,]" Oklahoma v. EPA, Nos. 12-9526, 12-9527, 2013 WL 3766986, at *19 (10th Cir. July 19, 2013), the State has failed to demonstrate that vacating the Final Rule based upon this alleged procedural error is appropriate.

## C. Coal Creek Station

The State and Great River Energy, the owner of the Coal Creek Station, challenge EPA's disapproval of the State's SIP determination that modified and additional separated overfire air with low $NO_x$ burner (SOFA plus LNB) with an emission limit of 0.17lb/MMBtu on a thirty-day rolling average basis was BART for

the Coal Creek Station. These petitioners also challenge EPA's FIP determination that selective non-catalytic reduction (SNCR) plus SOFA plus LNB with an emission limit of 0.13lb/MMBtu on a thirty-day rolling average is BART for the Coal Creek Station.

Energy production at the Coal Creek Station creates a by-product known as fly ash. Great River Energy is able to sell the fly ash created at the Coal Creek Station to construction companies to be used as a replacement for cement in the creation of concrete. During its BART analysis for the Coal Creek Station, the State concluded that using SNCR to control additional emissions at the plant would result in ammonia slip, which in turn would contaminate the fly ash, making it unsuitable for use in concrete. The State thus concluded that SNCR would cause Great River Energy to lose revenue from the sale of fly ash and would result in additional costs to dispose of the fly ash in landfills.

The State requested information regarding fly ash sales from Great River Energy, which informed the State that it received $36 per ton of fly ash sold. The State used this information to calculate the estimated cost effectiveness of implementing SNCR as $8,551 per-ton-of-$NO_x$ removed. This estimate included the cost of lost fly ash revenue and the additional cost of disposing the unusable fly ash. See Great River Energy Add. 57. The State calculated the cost effectiveness of SOFA plus LNB as $411 per-ton-of-$NO_x$ removed. Id. The State concluded that the incremental cost of SNCR over SOFA plus LNB was excessive, but that if fly ash sales were not lost using SNCR, that the cost would not be considered excessive. Id. at 61. The State also found that the incremental improvement in visibility of SNCR over SOFA plus LNB was only 0.105 deciviews. The State concluded that "[b]ecause of the potential for lost sales of fly ash, the negative environmental effects of having to dispose of the fly ash instead of recycling it into concrete, and the very small amount of visibility improvement from the use of SNCR, this option is rejected as

BART." Id. Instead, the State proposed that "BART is represented by modified and additional SOFA plus LNB[.]" Id.

During its review of the State's BART analysis for the Coal Creek Station, EPA identified a possible discrepancy regarding the projected costs associated with SNCR and requested additional information from Great River Energy to support its predictions on lost fly ash revenue. Great River Energy discovered that it had made a mistake in its disclosure to the State by stating that it received $36 per ton of fly ash in revenue, when its actual revenue from fly ash was only $5 per ton. On July 16, 2011, Great River Energy submitted corrected data regarding lost fly ash revenue, resulting in a projected cost effectiveness of SNCR as $2,318 per-ton-of-$NO_x$ removed. After reviewing the new data, EPA disapproved the State's BART determination for the Coal Creek Station. EPA concluded that the State's SIP failed to properly consider the cost of compliance in any meaningful sense as required by 40 C.F.R. § 51.308(e)(1)(ii)(A) because the cost of compliance analysis was based upon fundamentally flawed and greatly inflated cost estimates regarding lost fly ash revenue.

Having disapproved the State's BART determination, EPA proposed to promulgate a FIP imposing its own BART determination for the Coal Creek Station. After conducting its own BART analysis based upon the State's baseline emissions numbers for the Coal Creek Station established in 2003-2004, as well as the corrected lost fly ash revenue projections, EPA proposed to find that BART was SNCR plus SOFA plus LNB with an emission limit of 0.12lb/MMBtu on a thirty-day rolling average. 76 Fed. Reg. 58,622. Great River Energy submitted several comments on EPA's proposed BART determination, including its objections to EPA's calculations regarding cost effectiveness on the ground that EPA had failed to consider existing control technology in use at the Coal Creek Station. See, e.g., 77 Fed. Reg. 20,927. From 2006 to 2009, Great River Energy tested a prototype pollution control technology that is now known as DryFining™. Great River Energy voluntarily

-11-

installed a full version of the technology at the Coal Creek Station in 2009, two years prior to EPA's proposed BART determination. EPA acknowledged Great River Energy's comments but concluded that it was not required to consider voluntarily installed control technology that was installed after the baseline period. 77 Fed. Reg. 20,918. EPA's Final Rule concluded that BART was SNCR plus SOFA plus LNB, but determined that the emission limit should be 0.13lb/MMBtu on a thirty-day rolling average. 77 Fed. Reg. 20,899.

### 1. Disapproval of the State's BART determination

The State and Great River Energy contend that EPA's disapproval of the State's BART determination for the Coal Creek Station was arbitrary, capricious, and an abuse of discretion. They contend that because EPA is required to approve a SIP submission that meets all of the requirements of § 169A, see 42 U.S.C. § 7410(k)(3), and because the State's SIP contained an analysis of each mandatory BART factor, EPA was without authority to disapprove the SIP, notwithstanding that the cost of compliance factor was based upon admittedly erroneous data. Under the State and Great River Energy's interpretation of § 169A, EPA's role in reviewing a state's BART determination is limited to ensuring that at least minimal consideration is given to each factor and does not permit EPA to examine the rationality or reasonableness of the underlying decision.

EPA contends that it possessed the authority to disapprove the State's BART determination because the State had failed to consider, in any meaningful sense, the cost of compliance, which is a factor that a state must consider under the statute and the applicable guidelines. See 42 U.S.C. § 7491(g)(2); 40 C.F.R. § 51.308(3)(1)(ii)(A). EPA argues that although the BART analysis contained a discussion of the cost of compliance for SNCR, the discussion was based upon grossly erroneous data that skewed the results and prevented the State from properly considering this factor. Moreover, EPA notes that the State acknowledged in its SIP

-12-

that but for the cost of lost revenue for fly ash, the State would not have found the cost of compliance for SNCR excessive.

Although the CAA grants states the primary role of determining the appropriate pollution controls within their borders, EPA is left with more than the ministerial task of routinely approving SIP submissions. The Tenth Circuit recently concluded that EPA acted within its power under § 169A in rejecting a BART determination on the basis that the state "did not properly take into consideration the costs of compliance when it relied on cost estimates that greatly overestimated the costs of dry and wet scrubbing to conclude these controls were not cost effective." Oklahoma v. EPA, 2013 WL 3766986, at *3, *5-6 (internal quotation marks omitted). The court held that because the state's cost of compliance estimate was based upon fundamental methodological flaws, EPA had a reasonable basis for rejecting the state's BART determination for failure to comply with the requisite BART guidelines. Id. at *8. Moreover, in Alaska Department of Environmental Conservation v. EPA, 540 U.S. 461 (2004), the Supreme Court rejected an argument similar to that raised here regarding EPA's oversight role in the BACT determination process under § 167 of the CAA. The Court held that EPA was not limited simply to verifying that a BACT determination was actually made, concluding instead that EPA could examine the substance of the BACT determination to ensure that it was one that was "reasonably moored to the Act's provisions" and was based on "reasoned analysis." See id. at 485, 490. Although the Court's analysis was one under § 167, we nonetheless find it persuasive in the context of § 169A.

We see little difference between the rejection of a factor containing methodological flaws that led to an overestimated cost of compliance, as occurred in Oklahoma v. EPA, and the rejection of a factor containing data flaws that led to an overestimated cost of compliance, as occurred in this case. In both cases, the flaw in the analysis prevented the state from conducting a meaningful consideration of the factor, as required by the BART guidelines. As did the Supreme Court in its § 167

analysis in Alaska Department of Environmental Conservation, we reject the argument that EPA is required under § 169A to approve a BART determination that is based upon an analysis that is neither reasoned nor moored to the CAA's provisions. At oral argument, the State all but conceded EPA's ability to review the substantive content of the BART determination when it acknowledged that EPA would have the authority to disapprove a SIP if the state plainly proceeded without a sufficient factual basis. Accordingly, we conclude that EPA's disapproval of the State's BART determination for failing to consider the cost of compliance as required under the statute and the BART guidelines was neither arbitrary, capricious, nor an abuse of discretion.[2]

The State argues in the alternative that EPA's decision was arbitrary and capricious because it prematurely rejected the State's SIP based upon the data error in the cost of compliance factor before the State could supplement its SIP and address the data error. The State contends that it notified EPA that it would submit a supplemental BART determination for the Coal Creek Station once it received the projected final revised cost estimates from Great River Energy. The State argues further that EPA prematurely disapproved the State's original BART determination in its regional haze SIP, knowing that a supplemental BART determination was forthcoming.

---

[2]Nor do we find convincing Great River Energy's argument that under Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1129 (8th Cir. 1999), EPA was first required to prove that the data error was material to the State's determination before rejecting its BART determination all together. Friends of the Boundary Waters Wilderness is inapplicable because the data error discussed and addressed in that case was one contained in a factor voluntarily considered by the agency under a completely different regulatory act. In this case, the data error was contained in a factor that the State was obligated to properly consider under the CAA; thus, EPA need only demonstrate that the State failed to consider this factor as required by the CAA and accompanying regulations.

-14-

Under 42 U.S.C. § 7410(k)(2), EPA is required to take action on a SIP submission within twelve months of the date that the submission is deemed complete. EPA may approve the submission as a whole or in part, but whatever action it takes must be done within twelve months of the completed SIP submission. See 42 U.S.C. § 7410(k)(2)-(3). The State's regional haze SIP submission was deemed complete on April 30, 2011, leaving EPA until April 30, 2012, to take action thereon. Although Great River Energy submitted initial information regarding lost fly ash revenue on June 16, 2011, as of April 2012, it had yet to submit its final revised calculations regarding the projected costs associated with lost fly ash sales. EPA took final action on the State's SIP addressing the BART determination for the Coal Creek Station on April 6, 2012. Great River Energy did not submit its final revised calculations regarding the projected cost associated with lost fly ash sales until June 2012. The State has identified no provision of the CAA that obligated EPA to wait for its supplemental BART determination before disapproving its original Coal Creek Station BART determination. Nor has the State identified any provision that tolled the twelve-month period within which EPA was required to take final action. The State has thus failed to demonstrate that EPA's disapproval of the State's BART determination for the Coal Creek Station was arbitrary, capricious, or an abuse of discretion.

2. Promulgation of a FIP for the Coal Creek Station

In light of its decision to disapprove the State's SIP related to its BART determination for the Coal Creek Station, EPA was obligated under the CAA to promulgate a FIP within two years of the disapproval "unless the State correct[ed] the deficiency, and the Administrator approve[d] the plan or plan revision, before the Administrator promulgate[d] such Federal implementation plan." 42 U.S.C. § 7410(c)(1)(B). Great River Energy challenges EPA's determination that SNCR is BART for the Coal Creek Station on the ground that EPA violated the CAA by refusing to consider existing pollution control technology at the station during its

BART analysis. One of the statutory factors that a state and EPA must consider when determining BART is "any existing pollution control technology in use at the source." 42 U.S.C. § 7491(g)(2). During its BART analysis EPA refused to consider the DryFining™ pollution control technology in use at the Coal Creek Station, stating in its Final Rule that "DryFining™ was not installed until after the baseline period and was installed voluntarily, not to meet any regulatory requirement[,]" and that EPA was not required to reconsider cost estimates based on voluntarily installed controls installed after the baseline period. 77 Fed. Reg. 20,918. Great River Energy contends that EPA's refusal to consider the voluntarily installed pollution control technology in use at the Coal Creek Station demonstrates that EPA failed to consider all of the statutory factors required under 42 U.S.C. § 7491(g)(2) and 40 C.F.R. § 51.308(e)(1)(i)(A) and that its BART determination must therefore be vacated.

EPA contends that it was not required to consider the voluntarily installed pollution controls at the Coal Creek Station, including the DryFining™ technology, because it permissibly interpreted the ambiguous phrase "existing pollution control technology in use at the source" to mean existing technology "incorporated into emission limits in an approved SIP or specified in a Clean Air Act permit for the facility and . . . adopted to meet Clean Air Act requirements." EPA Br. 82. Making no mention of or giving any significance to the word "any" in § 7491(g)(2), EPA argues that its interpretation of the ambiguous statutory language "existing pollution control technology" is entitled to deference, presumably under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Great River Energy contends that EPA's interpretation of "any existing pollution controls" is entitled to no deference because the statutory language at issue is clear and unequivocal, not ambiguous.

Chevron deference is appropriate when an agency exercises its generally conferred authority to resolve a particular statutory ambiguity and the resulting interpretation is based on a permissible construction of the statute. See Chevron, 467

U.S. at 842-43.  To determine if an agency interpretation is entitled to <u>Chevron</u> deference,

> [W]e ask first whether the intent of Congress is clear as to the precise question at issue. If, by employing traditional tools of statutory construction, we determine that Congress' intent is clear, that is the end of the matter.  But if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.  If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer the court would have reached if the question initially had arisen in a judicial proceeding.

<u>Baptist Health v. Thompson</u>, 458 F.3d 768, 773 (8th Cir. 2006) (alteration in original) (citations omitted in original) (internal quotation marks omitted).

Under the first step of the <u>Chevron</u> analysis, we employ the traditional tools of statutory interpretation to determine whether the statute makes clear the intent of Congress as to the meaning of the phrase "any existing pollution control technology in use at the source." 42 U.S.C. § 7491(g)(2).  "As in all such cases, we begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'"  <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 130 S. Ct. 2149, 2156 (2010) (alteration in original) (quoting <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 175 (2009)).

The Supreme Court has acknowledged that "'any' can and does mean different things depending upon the setting." <u>Nixon v. Mo. Mun. League</u>, 541 U.S. 125, 132 (2004).  Nevertheless, "[i]n a series of cases, the Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.'" <u>New York v. EPA</u>, 443 F.3d 880, 885 (D.C. Cir. 2006) (quoting <u>Norfolk S. Ry. Co. v. Kirby</u>, 543 U.S. 14, 31-32

-17-

(2004)). This line of cases adopting an expansive meaning includes the interpretation of the term "any" under § 307(b)(1) of the CAA, 42 U.S.C. § 7607(b)(1). See Harrison v. PPG Indus., Inc., 446 U.S. 578 (1980).

An examination of the relevant statutory language in § 7491(g)(2) reveals "no reason to contravene the clause's obvious meaning[,]" Kirby, 543 U.S. at 31-32, nor has EPA proffered any reason to do so. We thus afford the term its obvious and expansive meaning and conclude that Congress's use of the term "any" to modify "existing pollution control technologies" demonstrates that it intended the decision maker to consider "one or some indiscriminately of whatever kind," Webster's Third International Dictionary (Unabridged), 97 (1981), of control technologies in use at the source, not simply those that are "incorporated into emission limits in an approved SIP or specified in a Clean Air Act permit for the facility and . . . adopted to meet Clean Air Act requirements." EPA Br. 82.

Because we find no ambiguity in the kind of technologies that must be considered under § 7491(g)(2), EPA's interpretation that it was not required to consider the existing pollution control technologies in use at the Coal Creek Station is entitled to no deference. Just as the State was required to properly consider each statutory factor in the BART analysis in the implementation of its SIP, so too was EPA in the promulgation of its FIP. Accordingly, EPA's refusal to consider the existing pollution control technology in use at the Coal Creek Station because it had been voluntarily installed was arbitrary and capricious and its FIP promulgating SNCR as BART for the Coal Creek Station is therefore vacated.

D. Antelope Valley Station

The State challenges EPA's disapproval of its reasonable progress determination for Antelope Valley Station Units 1 and 2 and EPA's subsequent promulgation of a FIP.

-18-

As discussed above, the CAA requires that states make determinations of reasonable progress for achieving natural visibility in Class I Federal areas. The state is required to analyze and determine the rate of progress necessary to achieve natural visibility conditions in the mandatory Class I Federal areas by the year 2064 and "consider the uniform rate of improvement in visibility and the emission reduction measures needed to achieve it for the period covered by the implementation plan." 40 C.F.R. § 51.308(d)(1)(i)(B). During its analysis, the State concluded that the rate of progress necessary "for the implementation plan to attain natural conditions by 2064 [was] not reasonable[.]" Id. § 51.308(d)(1)(ii). This determination allowed the State to implement a slower rate of progress but it also obligated the State to demonstrate that its reasonable progress goals were reasonable. Id.

When the State established its reasonable progress goals for the Theodore Roosevelt National Park and Lostwood Wilderness Areas it determined that additional pollution control technologies for Antelope Valley Station Units 1 and 2 were unnecessary to achieve reasonable progress. The State reached this conclusion after examining the four statutory factors that must be taken into account in determining reasonable progress under § 7491(g)(1): costs of compliance; the time necessary for compliance; the energy and non-air quality environmental impacts of compliance; and the remaining useful life of the units—as well as one nonstatutory factor, incremental visibility improvement. In its analysis of the projected improvement in visibility, the State created and used its own cumulative source visibility model, which employs current degraded background visibility conditions as its baseline. Using the cumulative source visibility model, the State concluded that the maximum combined improvement for the average of the 20% worst days was 0.11 deciviews at Lostwood Wilderness Area and 0.03 deciviews at Theodore Roosevelt National Park. The State then chose to evaluate the cost effectiveness of additional controls at Antelope Valley using the dollar-per-deciview of improvement metric rather than the more conventional dollar-per-ton-of-$NO_x$ removed metric. With the visibility numbers calculated using the cumulative source visibility model, the State

found that the cost effectiveness of additional controls would be 618 million dollars-per-deciview of improvement at Lostwood Wilderness Area and 2.3 billion dollars-per-deciview of improvement at Theodore Roosevelt National Park. The State found these costs excessive and determined that installing additional controls at the Antelope Valley Station was not reasonable.

EPA proposed to disapprove the State's determination, concluding that the decision not to install additional controls was unreasonable in light of the State's admission that it could not meet the uniform rate of progress to restore natural visibility in Class I Federal areas by 2064. EPA took issue with two aspects of the State's reasonable progress determination: the results of the State's incremental visibility improvement analysis and the results of the State's cost effectiveness analysis. Both sets of results were based upon the State's use of its cumulative source visibility modeling. In the Proposed Rule, EPA found "that North Dakota's visibility modeling significantly understates the visibility improvement that would be realized for the control options under consideration." 76 Fed. Reg. 58,627. EPA concluded:

> While it is reasonable for a state to consider visibility improvement as an additional factor in its reasonable progress analysis when evaluating visibility benefits from potential control options at individual sources, it is not appropriate to assume degraded background conditions, as the State did. As we note above, using degraded rather than natural background in the modeling produces estimates that greatly underestimate the benefits of potential control options. The ultimate goal of the regional haze program is to achieve natural visibility conditions, not to preserve degraded conditions.

76 Fed. Reg. 58,629. EPA also found that because of the greatly underestimated improvement in visibility attributable to the State's visibility model, that "cost effectiveness values, when expressed in dollars per deciview, were overestimated." Id. EPA thus proposed to disapprove the reasonable progress determination for Antelope Valley Station Units 1 and 2. In its place, EPA proposed to promulgate a

FIP determining that separated overfire air plus low $NO_x$ burners (SOFA + LNB) with an emission limit of 0.17 lb/MMBtu on a thirty-day rolling average represented reasonable progress for Units 1 and 2. 76 Fed. Reg. 58,632. EPA concluded that this technology would cost approximately $586 and $661 per-ton-of-$NO_x$ removed at Units 1 and 2 and would result in the total removal of approximately 3,500 tons of $NO_x$ per unit per year. Id.

The State challenges EPA's disapproval of its reasonable progress determination, contending that EPA's rejection of the incremental visibility improvement results and the dollars-per-deciview of improvement results based upon the State's cumulative source visibility modeling was arbitrary, capricious, and an abuse of discretion. Because this was a reasonable progress determination, the State contends that it was not obligated to use the single source visibility model required under the BART Guidelines and that it could instead develop and utilize its own visibility model. EPA concedes that the State was not obligated to use EPA's single source visibility model, but argues that if a state chooses to consider incremental visibility improvement in the reasonable progress context, it must do so in a manner that is consistent with the CAA.

As discussed above, EPA's review of a SIP extends not only to whether the state considered the necessary factors in its determination, but also to whether the determination is one that is reasonably moored to the CAA's provisions. See ante 12-14. This is especially true when a state is obligated to demonstrate that its determination is one that is reasonable, as was the case here. See 40 C.F.R. § 51.308(d)(1)(ii). In its review of the State's reasonable progress determination, EPA concluded that the cumulative source visibility model employing the current degraded conditions as its baseline was not consistent with the CAA. EPA noted that the use of such a visibility model will rarely if ever demonstrate that emissions reductions at a single source will have an appreciable effect on incremental visibility improvement in a given area. "This is true because of the nonlinear nature of

-21-

visibility impairment. In other words, as a Class I area becomes more polluted, any individual source's contribution to changes in impairment becomes geometrically less." 77 Fed. Reg. 20,912 (quoting 70 Fed. Reg. 39,124). EPA found that rather than restore Class I areas to natural conditions, such a visibility model will serve instead to maintain current degraded conditions. EPA's determination on this matter is entitled to judicial deference, as it involves "technical matters within its area of expertise[.]" Lockhart v. Kenops, 927 F.2d 1028, 1034 (8th Cir. 1991) (quoting Louisiana ex rel. Guste v. Verity, 853 F.2d 322, 329 (5th Cir. 1988)); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

The State's determination that no additional $NO_x$ controls were necessary for Antelope Valley Station Units 1 and 2 was based primarily on the lack of incremental visibility improvement expected from the installation of the technology and its excessive cost effectiveness on a dollars-per-deciview of improvement metric. Each of these conclusions, however, was reached through the use of the State's cumulative source visibility modeling. Although the State was free to employ its own visibility model and to consider visibility improvement in its reasonable progress determinations, it was not free to do so in a manner that was inconsistent with the CAA. Because the goal of § 169A is to attain natural visibility conditions in mandatory Class I Federal areas, see 42 U.S.C. § 7491(a)(1), and EPA has demonstrated that the visibility model used by the State would serve instead to maintain current degraded conditions, we cannot say that EPA acted in a manner that was arbitrary, capricious, or an abuse of discretion by disapproving the State's reasonable progress determination based upon its cumulative source visibility modeling.

Although the State has challenged EPA's promulgation of its FIP—concluding that reasonable progress for Antelope Valley Station Units 1 and 2 was SOFA+LNB with a 0.17 lb/MMBtu emission limit on a thirty-day rolling average—it has done so only on procedural grounds, arguing that because the disapproval of the SIP was improper, so too was the promulgation of the FIP. Because we conclude that EPA properly disapproved the State's reasonable progress determination, the State's challenge to the FIP necessarily fails. Accordingly, the State's petition for review of EPA's disapproval of the State's SIP and promulgation of a FIP is denied.

## E. Coyote Station

The Environmental Groups challenge EPA's approval of the 0.50 lb/MMBtu emission limit as reasonable progress for the Coyote Station.

As part of its regional haze SIP, the State conducted a reasonable progress determination for the Coyote Station. During this determination, the State evaluated several possible pollution control technologies, including advanced separated overfire air (ASOFA). The State estimated that installing ASOFA would result in a 40% reduction of $NO_x$ emissions. Although the State determined that ASOFA would result in a cost effectiveness of $246 per-ton-of-$NO_x$ removed, it concluded that the more appropriate measure of cost effectiveness for determining reasonable progress was expressed in dollars-per-deciview of improvement. Using its own visibility modeling discussed above, the State calculated a combined maximum improvement in deciviews over the 20% worst days at Lostwood Wilderness Area and Theodore Roosevelt National Park. As with the determination for Antelope Valley Station Units 1 and 2, the State used the projected visibility improvements to calculate the cumulative cost effectiveness of additional technologies of approximately 618 million dollars-per-deciview of improvement at Lostwood Wilderness Area and 2.3 billion dollars-per-deciview of improvement at Theodore Roosevelt National Park. Based

upon these cost effectiveness calculations, the State concluded that no additional $NO_x$ controls were reasonably necessary at the Coyote Station.

Notwithstanding this conclusion, the State engaged in negotiations with the owner of the Coyote Station, reaching an agreement that established an $NO_x$ emission limit of 0.50 lb/MMBtu on a thirty-day rolling average. This emission limit would be satisfied through the installation of additional pollution controls, assumed to be overfire air (OFA), that would remove approximately 4,213 tons of $NO_x$, which represents an approximate 32% decrease in emissions from the station's 2000-2004 baseline. This agreement was made enforceable through a permit for construction at the Coyote Station and was submitted with the State's SIP.

In its review of the State's reasonable progress determination, EPA concluded that the State had unreasonably rejected ASOFA as a potential technology representing reasonable progress because its decision was based on the same cumulative source visibility modeling discussed above. See 76 Fed. Reg. 58,630. Unlike the determination involving the Antelope Valley Station, however, the State nevertheless had included in its SIP an emission limit for the Coyote Station. EPA found the following:

> [W]e continue to disagree with the manner in which North Dakota evaluated visibility improvement when it evaluated single source controls and have disregarded this evaluation in our consideration of the reasonableness of North Dakota's reasonable progress control determinations. We also disagree with some of North Dakota's legal conclusions about the necessity of reasonable progress controls for certain sources—specifically, for Coyote Station for $NO_x$ and for Heskett Station 2 for sulfur dioxide ($SO_2$). However, in these instances, North Dakota nonetheless included emission limits in the SIP that reflect reasonable levels of control for reasonable progress for this initial planning period. Here again, we understand that there is room for disagreement about the State's analyses and appropriate limits. And,

again, we may have reached different conclusions had we been performing the determinations. However, the comments have not convinced us that the State, conducting specific case-by-case analyses for the relevant units, made unreasonable determinations for this initial planning period or that we should be disapproving the State's reasonable progress determinations that we proposed to approve.

77 Fed. Reg. 20,899. Therefore, after "disregard[ing] the State's visibility analysis . . . and instead focus[ing] on the four reasonable progress factors[,]" EPA concluded that the State's proposed 0.50 lb/MMBtu emission limit was not unreasonable. 77 Fed. Reg. 20,937.

The Environmental Groups first argue that EPA's approval of the 0.50 lb/MMBtu emission limit as reasonable progress was arbitrary, capricious, and an abuse of discretion because EPA could not find that the State unreasonably rejected ASOFA as a potential technology representing reasonable progress, while simultaneously approving the more lax 0.50 lb/MMBtu emission limit. But EPA's finding that the State unreasonably rejected ASOFA on the ground that it was not cost effective has no bearing on whether the emission limit was itself reasonable progress. EPA's implicit conclusion that ASOFA would have been technology representing reasonable progress does not mean that EPA concluded that ASOFA was the only technology representing reasonable progress. Even if ASOFA were perhaps the most reasonable technology available, the CAA requires only that a state establish reasonable progress, not the most reasonable progress. EPA acknowledged that had it been making the decision in the first instance, it perhaps would have chosen ASOFA, but concluded that was not its decision to make. Given the procedural posture, EPA was obligated to review the State's decision to ensure that the State's determination represented reasonable progress, which it concluded the State had done. We thus find nothing arbitrary about EPA's conclusion that ASOFA would have represented reasonable progress and its ultimate determination that the

-25-

0.50 lb/MMBtu emission limit contained in the SIP also represented reasonable progress.

The Environmental Groups argue in the alternative that EPA's decision approving the emission limit lacked a reasoned basis and therefore must be vacated. "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) (internal citation omitted). In its consideration of the emission limit as reasonable progress, EPA disregarded the State's visibility modeling and instead evaluated the emission limit against the four statutory factors for reasonable progress. See 77 Fed. Reg. 20,937. In the Proposed Rule, EPA acknowledged that ASOFA was estimated to reduce emissions by approximately 40%, see 76 Fed. Reg. 58,626, but also acknowledged that the emission limit established for the Coyote Station was estimated to reduce emissions by approximately 32%, see 76 Fed. Reg. 58,628. Furthermore, OFA technology might well be considered cost effective in light of EPA's conclusion that the more advanced version of the technology ASOFA was cost effective. Thus, although EPA's decision in this instance is not a model of clarity, we nonetheless can discern its path.

Because the Environmental Groups have failed to demonstrate that EPA's approval of the 0.50 lb/MMBtu emission limit as reasonable progress for the Coyote Station was arbitrary, capricious, or an abuse of discretion, their petition for review of this issue is denied.

F. Milton R. Young and Leland Olds Stations

The Environmental Groups contend that EPA's approval of the State's BART determinations for Milton R. Young Station Units 1 and 2 and Leland Olds Station

Unit 2 was arbitrary, capricious, and an abuse of discretion because it violated applicable notice and comments requirements and failed to provide a rational basis for EPA's change of position from the Proposed Rule to the Final Rule.[3]

The State determined during its evaluation of its regional haze obligations that these three units were subject to the BART requirements of § 169A. As discussed above, the second step in the BART Guidelines evaluation process involves the elimination of technically infeasible control technologies. See 70 Fed. Reg. 39,164. When the State conducted its BART analysis for each of these units, it eliminated selective catalytic reduction (SCR) as a potential control technology, concluding that SCR was not technically feasible for a unit that burned lignite coal in a cyclone boiler. The State thus concluded that BART for these units was SNCR. Contemporaneously, the State was also determining the best available control technology (BACT) for Young Station Units 1 and 2 pursuant to a consent decree entered into between the owner of the station, the State, and EPA under the CAA's Prevention of Significant Deterioration program. The consent decree gave the State the initial responsibility of determining BACT and gave EPA the authority to challenge that determination in the district court if it believed that it was unreasonable. BART and BACT both involve the elimination of technically infeasible control options, using substantially the same criteria. See 77 Fed. Reg. 20,897. In its BACT analysis, the State similarly concluded that SCR was technically infeasible because of the type of coal and type of boiler at issue and instead selected SNCR as BACT. EPA promptly challenged the State's BACT determination in district court, contending that SCR was a technically feasible emission control and should have been selected as BACT.

---

[3]Young Station Units 1 and 2 and Olds Station Unit 2 each generate electricity by burning North Dakota lignite coal in Babcock & Wilcox cyclone boilers. Because each of these units operates the same type of boiler and burns the same type of coal, the technical feasibility determination required under the BART Guidelines will be the same for each unit. They are thus addressed together.

While EPA's petition challenging the State's BACT determination was pending, it proposed to disapprove the State's regional haze SIP, determining that BART for Young Station Units 1 and 2 and Olds Station Unit 2 was SNCR. The basis for EPA's proposed disapproval of the SIP mirrored its position in its petition challenging the State's BACT determination, namely, its belief that SCR was technically feasible and that the State's determination that it was not technically feasible was unreasonable. EPA acknowledged the district court proceeding in the Proposed Rule, stating that its "proposed action here pertains to BART, not BACT, is governed by CAA provisions and regulations specific to regional haze and BART, and is not governed by [the] consent decree." 76 Fed. Reg. 58,604 n.41. EPA simultaneously proposed to promulgate a FIP finding that SCR was BART for these units. On December 21, 2011, after the notice and comment period for the Proposed Rule had closed, the district court issued its decision on EPA's petition challenging the State's BACT determination. The district court found that the State's conclusion that SCR was not technically feasible was not unreasonable. See Minnkota Power Co-op., 831 F. Supp. 2d at 1127-30.

Rather than disapproving the State's determination that SNCR was BART for Young Station Units 1 and 2 and Olds Station Unit 2 and promulgating its own FIP, EPA's Final Rule approved the State's SIP. In explaining its decision, EPA found two portions of the BART Guidelines relevant. First, EPA noted that the technical feasibility determination under the BART and BACT analyses was substantially the same. See 77 Fed. Reg. 20,897. Second, EPA noted that the BART Guidelines permit a state to rely upon a BACT determination for purposes of selecting BART, unless new technologies have become available or best control levels for recent retrofits have become more stringent. See id. EPA then acknowledged that over its "vigorous challenge of the information and analysis relied upon by North Dakota, the U.S. District Court upheld North Dakota's recent BACT determination based on the same technical feasibility criteria that apply in the BART context." Id. at 20,897-98. EPA concluded that "[i]n light of the court's decision and the views we have

-28-

expressed in our BART guidelines, we have concluded that it would be inappropriate to proceed with our proposed disapproval of SNCR as BART[.]" Id. at 20,898. Accordingly, EPA approved the State's SIP addressing the BART determinations for Young Station Units 1 and 2 and Olds Station Unit 2.

Thereafter, the Environmental Groups filed this petition for review, while simultaneously filing a petition for reconsideration with EPA. On November 19, 2012, after all of the petitioners had filed their initial briefs, EPA granted the Environmental Groups' petition for reconsideration, a process that is still ongoing. On February 8, 2013, after briefing in the present case was completed, the Environmental Groups moved under Federal Rule of Appellate Procedure 42(b) to voluntarily dismiss their petition to the extent it challenges EPA's approval of the State's BART determination for Young Station Units 1 and 2 and Olds Station Unit 2.

"[T]he procedural requirements of the Clean Air Act do not permit [petitioners] to raise . . . objection[s] for the first time on appeal." Appalachian Power Co. v. EPA (Appalachian Power II), 249 F.3d 1032, 1055 (D.C. Cir. 2001) (first two alterations in original) (quoting Am. Petroleum Inst. v. Costle, 665 F.2d 1176, 1190-91 (D.C. Cir. 1981)). "Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B). Section 7607(d)(7)(B) is "a jurisdictional administrative exhaustion requirement," Noel Canning v. NLRB, 705 F.3d 490, 497 (D.C. Cir. 2013), which courts are to strictly enforce, Natural Res. Def. Council, 571 F.3d at 1259. "The purpose of the exhaustion requirement is to ensure that the agency is given the first opportunity to bring its expertise to bear on the resolution of a challenge to a rule." Appalachian Power I, 135 F.3d at 818. "Consequently, the court enjoys the benefit of the agency's expertise and possibly avoids addressing some of the challenges unnecessarily." Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 462 (D.C. Cir. 1998).

EPA contends that the Environmental Groups' challenges to the approval of these BART determinations are not properly before us because they are being raised for the first time on appeal. The Environmental Groups acknowledge that because they had no notice that EPA was considering approving the BART determinations prior to publication of the Final Rule they did not raise a challenge to EPA's approval during the rulemaking process. In such circumstances, "the CAA requires a petitioner to first raise its objection to the agency th[r]ough a petition for reconsideration." Oklahoma v. EPA, 2013 WL 3766986, at *11 (alteration in original) (quoting Appalachian Power II, 249 F.3d at 1065). The Environmental Groups have done just that, filing a petition for reconsideration that is still under consideration.

Notwithstanding the Environmental Groups' failure to raise these objections during the rulemaking process, Intervenors Minnkota Power Cooperative, Inc. and Square Butte Electric Cooperative argue that § 7607(d)(7)(B) does not deprive us of jurisdiction. Intervenors contend that because § 7607(d)(7)(B) permits courts to stay the effectiveness of a final rule during reconsideration, it "expressly contemplates that a reviewing court retains subject matter jurisdiction over the claims during the pendency of EPA reconsideration." Intervenors Minnkota & Square Butte Br. 52 (citing § 7607(d)(7)(B) ("Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by . . . the court for a period not to exceed three months.")). Intervenors are incorrect that this section contemplates that we retain jurisdiction to hear unexhausted claims. Rather, it establishes that we retain jurisdiction over the entire final rule pending the reconsideration of unexhausted claims, and thus have the authority to postpone the effectiveness of the entire final rule.

Because the Environmental Groups' challenges to EPA's approval of the State's BART determination for Young Station Units 1 and 2 and Olds Station Unit 2 were not raised before EPA during the rulemaking process, we conclude that we are without jurisdiction to hear them under § 7607(d)(7)(B). This conclusion renders

moot the Environmental Groups' motion to dismiss their petition for review of these matters under Federal Rule of Appellate Procedure 42(b).

## H. Interstate Transport SIP

The State contends that EPA's disapproval of its interstate transport SIP was arbitrary, capricious, and an abuse of discretion. In July 1997, EPA promulgated new NAAQS, which triggered the State's obligation to submit an interstate transport SIP addressing the new standards. As discussed above, one of the elements of this SIP is the "good neighbor" provision, which contains a visibility component. See 42 U.S.C. § 7410(a)(2)(D)(i)(II). In 2006, EPA issued guidance to the states on satisfying the good neighbor provision. See Environmental Protection Agency, Guidance for State Implementation Plan Submissions to Meet Current Outstanding Obligations Under Section 110(a)(2)(D)(i) for the 8-Hour Ozone and PM$_{2.5}$ National Ambient Air Quality Standards (2006) [hereinafter 2006 Guidance].

The first paragraph of the 2006 Guidance "emphasizes that this guidance document merely provides suggestions and . . . EPA may elect to follow or deviate from this guidance, as appropriate." See id. at 1. Regarding the visibility component of the good neighbor provision, the 2006 Guidance recognized that because states' regional haze SIPs were not due until December 17, 2007, it was "currently premature" to determine whether a state's SIP complies with the good neighbor provision. Id. at 9-10. Therefore, the 2006 Guidance suggested "that States may make a simple SIP submission confirming that it is not possible at this time to assess whether there is any interference with measures in the applicable SIP for another State designed to 'protect visibility' for the 8-hour ozone or PM$_{2.5}$ NAAQS until regional haze SIPs are submitted and approved." Id. "Thus, EPA's recommendation to states as of that particular point in time was that they refer to the imminent regional haze SIP submission as the means by which they could address the visibility prong of [§ 7410(a)(2)(D)(i)]." 76 Fed. Reg. 58,642.

On April 6, 2009, the State submitted a SIP revision designed to satisfy its interstate transport requirements under the CAA. The State did not substantively address the visibility component, but instead referred to the 2006 Guidance and included a placeholder submission, stating that until regional haze SIPs were submitted, it was not possible to assess whether there is any interference with measures in another state's applicable regional haze SIP. The State thus suggested that it planned to satisfy the visibility component through the submission of its regional haze SIP, which it submitted on March 3, 2010.

EPA reviewed the State's interstate transport SIP in 2011 and approved three of the four components, but disapproved the visibility component. EPA rejected the State's use of the placeholder submission suggested in the 2006 Guidance and found that the SIP had failed to address substantively the visibility prong. EPA also concluded that the regional haze SIP could not be used to satisfy the visibility component because it was not fully approvable. See 76 Fed. Reg. 58,642. To address the visibility component, EPA proposed to promulgate a FIP. The FIP concluded that the visibility component would be satisfied by relying on a combination of the portions of the State's regional haze SIP that had been approved and the FIP promulgated to replace the disapproved portions of the regional haze SIP.

The State first contends that EPA acted arbitrarily by not following its 2006 Guidance and refusing to accept its placeholder submission for the visibility component. We disagree, for the 2006 Guidance clearly placed the State on notice that EPA was not issuing binding regulations but was instead only issuing suggestions that left EPA free "to follow or deviate from this guidance, as appropriate." 2006 Guidance at 1. Moreover, the 2006 Guidance suggested that it was "currently premature" to require a submission addressing visibility prior to the 2007 deadline for regional haze SIP submissions. This demonstrates that the 2006 Guidance contained time-sensitive suggestions. It is undisputed that the State did not submit its interstate transport SIP until 2009, well after the period discussed in the

2006 Guidance. Given the disclaimer within the 2006 Guidance that EPA was free to deviate from it, as well as the time frame during which it was issued—prior to the deadline for submitting regional haze SIPs—the State has failed to demonstrate that EPA's refusal to accept the State's placeholder statement regarding the visibility component was arbitrary, capricious, or an abuse of discretion.

The State argues in the alternative that its submission of the regional haze SIP satisfied the visibility component of the interstate transport SIP. EPA concluded, however, that because the regional haze SIP was not fully approvable, it could not satisfy the visibility component of the interstate transport SIP. The State does not challenge EPA's authority to disapprove the interstate transport SIP on this basis. Rather, it contends that because the regional haze SIP should have been approved as to all portions, it should have satisfied the visibility component in its interstate transport SIP. See State's Reply Br. 36 ("Because EPA's disapproval of North Dakota's [Coal Creek Station] BART determination and [Antelope Valley Station reasonable progress] determinations were arbitrary and capricious, so too is EPA's disapproval of North Dakota's SIP as it pertains to interstate visibility."). Because we have concluded that EPA properly disapproved portions of the State's regional haze SIP, the State's argument on this issue fails, and thus the State's petition for review of EPA's disapproval of the State's interstate transport SIP is denied.

## III. Conclusion

We grant the State's and Great River Energy's petitions for review to the extent that they challenge EPA's BART determination for the Coal Creek Station promulgated in EPA's FIP, and we vacate and remand that portion of the Final Rule to EPA for further proceedings consistent with this opinion. We deny the remainder of the State's, Great River Energy's, and the Environmental Groups' petitions for review, as well as the Environmental Groups' motion for voluntary dismissal under Federal Rule of Appellate Procedure 42(b).

———————————————