# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-3084
_____

State of Nebraska

*Petitioner*

v.

United States Environmental Protection Agency; Gina McCarthy, Administrator,
United States Environmental Protection Agency

*Respondent*s

Sierra Club; National Parks Conservation Association

*Intervenor*s
_____

No. 12-3085
_____

National Parks Conservation Association; Sierra Club

*Petitioner*s

v.

United States Environmental Protection Agency; Lisa P. Jackson, Administrator

*Respondent*s

Nebraska Public Power District; State of Nebraska

*Intervenor*s

_____

Petition for Review of an Order of the
Environmental Protection Administration

_____

Submitted: September 23, 2015
Filed: February 3, 2016

_____

Before RILEY, Chief Judge, BYE and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

On July 6, 2012, EPA partially disapproved the Nebraska Regional Haze State Implementation Plan. EPA specifically rejected Nebraska's best available retrofit technology (BART) determination for Gerald Gentleman Station, substituting a Federal Implementation Plan. The State of Nebraska petitioned for review. National Parks Conservation Association and Sierra Club (conservation organizations) not only oppose Nebraska's petition but also seek review of EPA's federal plan. Nebraska Public Power District intervened on behalf of EPA, opposing the conservation organizations. Having jurisdiction under 42 U.S.C. § 7607(b)(1), this court denies the petitions for review.

I.

A.

Congress declares as a national goal "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution." **42 U.S.C. § 7491(a)(1)**. The

Clean Air Act controls air pollution through a system of shared federal and state responsibility. *See* **Gen. Motors Corp v. United States**, 496 U.S. 530, 532 (1990). To achieve the national goal, each state must create a regional haze plan and submit it to EPA for review and approval. **42 U.S.C. §§ 7410(a)(1), 7491(b)(2)**. EPA determines if the plan "meets all the applicable requirements of [the Act]." **§ 7410(k)(3)**. If EPA disapproves a plan, EPA promulgates a federal implementation plan to replace any disapproved part of the state plan. **§ 7410(c)(1)(B)**.

A state plan must require specific major stationary sources that "emit[] any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility" to "procure, install, and operate, as expeditiously as practicable (and maintain thereafter) the best available retrofit technology." **§ 7491(b)(2)(A)**. BART is "an emission limitation based on the degree of reduction achievable through the application of the best system of continuous emission reduction" for visibility-impairing pollutants emitted by specific stationary facilities. **40 C.F.R. § 51.301**. To determine BART, a state must consider five factors: "the costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology." **42 U.S.C. § 7491(g)(2)**. Although states initially determine BART emission limits, EPA steps into a state's shoes if it determines that a state's BART determination does not meet the requirements of the Act. *See* **§ 7491(b)(2)(A)**; **§ 7410(k)(3)**.

A state may use an alternative to BART if there will be an "overall improvement in visibility," based on a comparison of "the average differences between BART and the alternative over all affected Class I areas." **40 C.F.R. § 51.308(e)(3)(ii)**. In 2012, EPA determined that the Transport Rule, "also known as the Cross-State Air Pollution Rule (CSAPR), achieve[s] greater reasonable progress towards the national goal of achieving natural visibility conditions in Class I areas

than source-specific [BART] in those states covered by the Transport Rule." **Regional Haze: Revisions to Provisions Governing Alternatives to Source-Specific BART**, 77 Fed. Reg. 33,642 (June 7, 2012) (Better than BART Rule). *See also* **Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone**, 76 Fed. Reg. 48,208 (Aug. 8, 2011) (Transport Rule); *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) (upholding the Transport Rule). A state subject to the Transport Rule, like Nebraska, "need not require BART." **§ 51.308(e)(4)**.

B.

Gerald Gentleman Station—a Nebraska electric plant subject to BART—"affects six Class I areas greater than 0.5 dv [deciviews] on average: Badlands and Wind Cave in South Dakota; Wichita Mountains in Oklahoma; Rocky Mountain in Colorado; and Hercules Glades and Mingo in Missouri." **Proposed Rule; Nebraska; Regional Haze State Implementation Plan**, 77 Fed. Reg. 12,770, 12,779 (Mar. 2, 2012). A deciview is a measure of visibility impairment; the higher the deciview, the greater the impairment. **40 C.F.R. § 51.301**. The Station has a "cumulative baseline impact on these six Class I areas of 8.86 dv." **77 Fed. Reg.** at 12,779. The station, the largest source of $SO_2$ pollution in Nebraska, has the potential to emit a baseline of 31,513 tons of $SO_2$ per year. *Id.* at 12,779-80.

Nebraska submitted a state implementation plan to EPA. *Id.* at 12,775. Determining BART for the Station, Nebraska's plan "evaluated wet and dry FGD [Flue Gas Desulfurization] and Dry Sorbent Injection (DSI) for $SO_2$ controls."[1] *Id.*

---

[1] FGD is the removal, after combustion, of $SO_2$ from flue gases. **Nebraska Dep't of Envtl. Quality Fact Sheet** 11-12 (May 11, 2010). Wet FGD is a scrubbing system that reduces $SO_2$—typically consisting of the following operations: "scrubbing or absorption, lime handling and slurry preparation, sludge processing,

-4-

at 12,779.  Nebraska noted, "FGD control would offer an improvement of 3.71 dv across the six Class I areas."  *Id.*  Nebraska asserted that the costs for FGD controls "were reasonable on a cost per ton basis, but not on a dollars per deciview basis."  *Id.*  According to EPA, however, Nebraska "only provided visibility information for DSI at Badlands" so the cumulative effect of DSI is unknown.  *Id.*  Nebraska concluded that BART for the Station requires "no $SO_2$ controls."  *Id.*

EPA disagreed.  In its final ruling, EPA disapproved Nebraska's determination that BART does not require $SO_2$ controls for the Station.  **Final Rule; Nebraska; Regional Haze State Implementation Plan; Federal Implementation Plan**, 77 Fed. Reg. 40,150, 40,151 (July 6, 2012).  EPA cited errors in "Nebraska's cost analysis for FGD controls, the reasonableness of the costs of controls, the significant visibility improvement achieved as a result of installing FGD or DSI, and improper rejection of DSI."  *Id.* at 40,152; *see also* **77 Fed. Reg.** at 12,780.  EPA then promulgated a federal implementation plan to satisfy the Act.  EPA's plan relied on the Transport Rule as an alternative to source-specific BART for $SO_2$ emissions from the Station.  **77 Fed. Reg.** at 40,151.  EPA did decline to "require specific $SO_2$ controls on [the Station] as a geographic enhancement" in addition to the Transport Rule.  *Id.* at 40,164.  Nebraska and the conservation organizations petition for review.

---

and flue gas handling."  *Id.* at 12.  This wet FGD technology is a "well established process for removing $SO_2$ from flue gas."  *Id.*  Dry FGD, also a well-established process, includes "a loop to recycle a portion of the bag-house collected material for re-use in the FGD module."  *Id.*  Both types of FGD are commonly called "scrubbers."

"DSI involves the injection of a sorbent into the ductwork upstream of the unit's particulate control system" and is a feasible "control option [that] uses very little water."  **Nebraska State Implementation Plan** 64 (June 30, 2011).

II.

This court sets aside EPA's action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." **Sierra Club v. EPA**, 252 F.3d 943, 947 (8th Cir. 2001), *quoting* **5 U.S.C. § 706(2)(A)**. An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." **Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.**, 463 U.S. 29, 43 (1983). This standard "is narrow and a court is not to substitute its judgment for that of the agency." **Id.** A court "'may not supply a reasoned basis for the agency's action that the agency itself has not given' . . . . however, [the Court will] 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" **Id.**, *quoting* **SEC v. Chenery Corp.**, 332 U.S. 194, 196 (1947) *and* **Bowman Transp. Inc. v. Arkansas-Best Freight Sys.**, 419 U.S. 281, 286 (1974).

A.

Nebraska claims that EPA should have approved its plan. It argues that EPA exceeded its statutory authority in disapproving Nebraska's BART determination for the Station.

The Act "grants states the primary role of determining the appropriate pollution controls within their borders." **North Dakota v. EPA**, 730 F.3d 750, 760-61 (8th Cir. 2013). Congress, however, gave EPA the authority to review state plans to ensure they meet "all of the applicable requirements of [the Act]." **42 U.S.C. § 7410(k)(3)**. EPA's role in reviewing state BART determinations is more than "ministerial" and "extends not only to whether the state considered the necessary factors in its

determination, but also to whether the determination is one that is reasonably moored to the [Act's] provisions." *North Dakota*, 730 F.3d at 761, 766. In similar circumstances, the Supreme Court held that "EPA was not limited simply to verifying that a [best available control technology (BACT)] determination was actually made, concluding instead that EPA could examine the substance of the BACT determination to ensure that it was one that was 'reasonably moored to the Act's provisions' and was based on 'reasoned analysis.'" *Id.* at 761, *quoting Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 485, 490 (2004). In *Alaska*, the Court explained that only when a state agency's determination is "'not based on a reasoned analysis' . . . may EPA step in to ensure that the statutory requirements are honored." *Alaska*, 540 U.S. at 490.

In its state plan, Nebraska considered the required five factors in determining BART for the Station. *See* **40 C.F.R. § 51.308(e)(1)(ii)(A)**; **42 U.S.C. § 7491(g)(2)**. "All five . . . factors inform the states' inquiries into what BART controls are appropriate for particular sources. Although no weights were assigned, the factors were meant to be considered together by the states." *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 6 (D.C. Cir. 2002). A state considers these factors to determine whether "the degree of improvement in visibility obtained from installing a particular set of emission controls" justifies the cost. *Id.* at 7.

Evaluating $SO_2$ controls at the Station, Nebraska focused on dry and wet FGD. Under Nebraska's analysis, the costs for dry and wet FGD were "$2,726 per ton and $2,724 per ton, respectively." **77 Fed. Reg.** at 12,779. It determined that the cost-effectiveness for both types of FGD was "reasonable on a cost per ton basis." *Id.* As part of the reasonable cost-effectiveness, the visibility improvement was deemed "significant." *Id.* Yet, Nebraska raised "water use of wet and dry FGD as a significant non-air environmental impact." *Id.* Nebraska concluded that "the cost of obtaining water to operate wet FGD would add approximately 8.6 percent to the cost

of controls," increasing the cost per ton to $2,958. *Id.* Weighing the factors, Nebraska determined that BART for the Station was no $SO_2$ controls. *Id.*

EPA disagreed. It found "Nebraska's blanket dismissal of any $SO_2$ control under the 'non-air quality environmental impact' factor was unreasoned." **77 Fed. Reg.** 40,161. EPA determined that Nebraska erred in its "cost analysis for FGD controls, the reasonableness of the costs of controls, the potential for significant visibility improvement as a result of installing FGD or DSI, and improper rejection of DSI." *Id.* EPA found that even considering the cost of obtaining water, the "costs were still found to be reasonable, particularly given the significant visibility benefits." *Id.* EPA acknowledged "the concerns about water availability, and recognizes the great care that the State takes to manage limited water resources. [EPA] also acknowledge[s] the goals of the Integrated Management Plans (IMP) and obligations of the Platte River Recovery Plan." *Id.* at 40,162. Additionally, at "$2,058 per ton, and a visibility improvement of 0.86 dv at the closest Class I area, EPA considers DSI to be cost effective, and the visibility improvements to be significant at the closest Class I area." *Id.* at 40,161. EPA disapproved Nebraska's BART determination for the Station because it was "based on flawed analysis and an unreasonable conclusion." **77 Fed. Reg.** at 40,153.

Nebraska does not dispute the facts found by EPA. Rather, Nebraska claims EPA performed its own analysis and substituted its determinations for the state's, when it should have assessed the reasonableness of Nebraska's determinations. This court considered a similar situation in the *North Dakota* case. EPA there disapproved North Dakota's BART determination for a coal-powered electric plant. ***North Dakota***, 730 F.3d at 760. Reviewing the state's BART determination, "EPA concluded that the State's [plan] failed to properly consider the cost of compliance in any meaningful sense . . . because the cost of compliance analysis was based upon fundamentally flawed and greatly inflated cost estimates." *Id.* This court noted that "the flaw in the analysis prevented the state from conducting a meaningful

-8-

consideration of the factor, as required by the BART guidelines" and rejected "the argument that EPA is required under [the Act] to approve a BART determination that is based upon an analysis that is neither reasoned nor moored to [the Act's] provisions." *Id.* at 761. This court affirmed EPA's disapproval of North Dakota's BART determination. *Id.*

As in the *North Dakota* case, EPA found errors in Nebraska's determinations. For example, Nebraska's evaluation of the cost of FGD controls contained "errors and deviations from EPA's Cost Control Manual," leading Nebraska to overestimate the costs. **77 Fed. Reg.** at 12,780. *Compare Oklahoma v. EPA*, 723 F.3d 1201, 1212 (10th Cir. 2013) (concluding EPA "had a reasonable basis for rejecting" cost estimates not in compliance with its guidelines). EPA found that FGD controls are capable of controlling emissions to a greater degree than Nebraska had assumed, and that Nebraska overestimated the Station's emissions baseline at 49,785 tons per year, skewing its analysis of the proposed controls' cost-effectiveness. **77 Fed. Reg.** at 12,780. These errors resulted in "the overestimation of the costs of FGD controls." *Id.* EPA found that Nebraska provided no adequate explanation for rejecting DSI, which "does not consume as much water as does FGD." *Id.*

Nebraska alleges that EPA simply disagreed with its numbers and replaced its analysis with EPA's own. "Left to evaluate the arguments of the parties' experts, we must give deference to the EPA. . . . we cannot adopt [petitioners'] analysis given that the EPA was aware of, and provided explanations contradicting, petitioners' comments." *Oklahoma*, 723 F.3d at 1216-17. Given Nebraska's errors and EPA's determination that Nebraska's action was unreasoned, this court denies Nebraska's petition for review.

B.

Because the Nebraska Plan lacked an approvable BART determination, EPA promulgated a federal implementation plan to satisfy the Act. EPA's plan relies on

the Transport Rule in place of source-specific BART for the Station. The conservation organizations object.

EPA asserts that it "does not dispute the Court's jurisdiction to review EPA's action in promulgating a partial [federal plan] for Nebraska." However, EPA argues that the conservation organizations' petition for review of the EPA's plan is "nothing more than [a] collateral attack[] on the nationwide better-than-BART rule itself, and as such [is] not properly before the Court." This court has jurisdiction over their petition for review, including the challenge to EPA's reliance on the Transport Rule, because the plan is a locally or regionally applicable action. *See Nat'l Parks Conservation Ass'n v. McCarthy*, 2016 WL 240768, at *4 (8th Cir. Jan. 21, 2016) (holding that this court "has jurisdiction to consider a petition for review of the Minnesota Plan, including the claim that EPA's approval of the Transport Rule for the five [facilities] is 'arbitrary or capricious.'"). *See also Dalton Trucking, Inc. v. EPA*, 2015 WL 9258716, at *3 (D.C. Cir. Dec. 18, 2015) ("Lest there be any confusion going forward, we reiterate what the Supreme Court made clear thirty-five years ago: Section 307(b)(1) is a 'conferral of jurisdiction upon the courts of appeals.'"), *quoting Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 593 (1980).

The EPA's plan does not meet the exception to the rule for locally or regionally applicable actions, as EPA did not find and publish a determination that the plan has nationwide scope or effect. *Lion Oil Co. v. EPA*, 792 F.3d 978, 981 (8th Cir. 2015) (stating that this court may hear a petition unless it is "based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination."), *quoting* **42 U.S.C. § 7607(b)(1)**. *See also Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013) (explaining that 42 U.S.C. § 7607(b)(1) creates two routes to the D.C. Circuit, the second of which is that "EPA may determine that the otherwise locally or regionally applicable regulations have a nationwide scope or effect.").

The conservation organizations assert that EPA's reliance on the Transport Rule is arbitrary, capricious, and contrary to law because EPA did not consider or respond to evidence that FGD and DSI controls will reduce emissions and improve visibility more than the Transport Rule. EPA determined that the FGD and DSI controls at the Station were cost-effective and feasible. **77 Fed. Reg.** at 40,162-63. EPA found that if BART were used, the FGD controls would reduce $SO_2$ emissions from the station by 23,147 tons per year (at 0.15 lbs/MMBtu) and by 28,166 tons per year (at 0.06 lbs/MMBtu). **77 Fed. Reg.** at 12,780. Applying the Transport Rule to the Station, EPA's plan reduces $SO_2$ emissions by only 4,010 tons per year. In its final rule, EPA did not detail why the Transport Rule was better than source-specific BART for the Station. **77 Fed. Reg.** at 40,164-65. EPA did state that it "has the flexibility pursuant to 40 C.F.R. 51.308(e)(3) to adopt an emissions trading program or other alternative program as long as the alternative provides greater reasonable progress towards improving visibility than BART." *Id.* at 40,164. EPA did then refer to its finding in the Better than BART Rule that the Transport Rule achieves "greater reasonable progress towards the national goal of achieving natural visibility conditions in Class I areas than source-specific BART." *Id.*, *citing* to **77 Fed. Reg. 33,642**.

"Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 497, *quoting* ***Bowman Transp., Inc.***, 419 U.S. at 286. EPA may use an alternative to BART if there will be an "*overall* improvement in visibility," based on a comparison of "the *average* differences between BART and the alternative over all affected Class I areas." **40 C.F.R. § 51.308(e)(3)(ii)** (emphasis added). EPA's plan reiterated that it demonstrated in the Better than BART Rule that "on average, the Transport Rule results in greater average visibility improvement at affected Class I areas compared to application of BART nationwide." **77 Fed. Reg.** at 40,165. Although the Transport Rule may not reduce the Station's emissions as much as source-specific

BART, the EPA determined that the Transport Rule—when compared to BART—will result in greater improvement over all affected Class I areas. **77 Fed. Reg.** at 33,642.

In the final Better than BART Rule, EPA noted in response to comments that "the omission of Gerald Gentleman Unit 2 from the BART-eligible inventory . . . would [not] affect the outcome of [its] national analysis." *Id.* at 33,651. The EPA explained that "the emission reductions from a single [electric generating unit] in the BART control scenario would not change the average visibility improvement across all affected Class I areas, which is the basis for [EPA's] determination." *Id.* According to EPA's modeling, source-specific BART provides 0.1 deciview improvement over the Transport Rule on the 20% worst-visibility days in Badlands National Park and Wind Cave National Park. **EPA's Technical Support Document for Demonstration of the Transport Rule as a BART Alternative**, Docket ID EPA-HQ-OAR-2011-0729-0014, at 34-36 (Dec. 2011). Transport Rule and source-specific BART achieve the same visibility improvement for the 20% worst-visibility days in Rocky Mountain National Park. *Id.* at 35. Transport Rule achieves greater improvement on the 20% worst-visibility days in Hercules Glades Wilderness (0.8 dv improvement over BART) and Wichita Mountains (0.4 dv improvement over BART).[2] *Id.* at 34, 36.

When "analysis of the relevant information 'requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999), *quoting* ***Marsh v. Oregon Natural Res. Council***, 490 U.S. 360, 377 (1989). Although the Transport Rule allows for more emissions from the Station than source-specific BART, the record indicates that the Transport Rule improves

---

[2]The Better than BART Rule did not expressly address the final affected Class I area, Mingo Wilderness in Missouri.

visibility significantly at some of the affected Class I areas and performs comparably to BART at the other areas. "[T]he focus of the Clean Air Act [is] to achieve 'actual progress and improvement in visibility' . . . not to anoint BART the mandatory vehicle of choice." ***Ctr. for Energy & Econ. Dev. v. EPA***, 398 F.3d 653, 660 (D.C. Cir. 2005). *See also* ***Util. Air Regulatory Grp. v. EPA***, 471 F.3d 1333, 1340 (D.C. Cir. 2006) (squarely rejecting the "claim that the Clean Air Act requires EPA to ensure that any BART-alternative improves visibility at least as much as BART at every Class I area and in all categories of days."). EPA's reliance on the Transport Rule for the Station was not arbitrary, capricious, or otherwise not in accordance with the law.

## C.

The conservation organizations challenge the EPA's rejection of a geographic enhancement—a scrubber—to supplement Transport Rule allowances at the Station. The conservation organizations repeatedly emphasize that, by EPA's logic in rejecting Nebraska's plan, EPA should have required a scrubber in its own plan.

Per EPA regulations, "A state [following the Transport Rule allowances] *may* adopt provisions . . . for a geographic enhancement to the program to address the requirement under § 51.302(c) related to BART for reasonably attributable impairment from the pollutant covered by such trading program in that State." **40 C.F.R. § 51.308(e)(4)** (emphasis added). Under § 51.302(c), a Federal Land Manager "may certify to the State, at any time, that there exists reasonably attributable impairment of visibility [RAVI] in any mandatory Class I Federal area." **§ 51.302(c)(1)**. *See also* ***Nat'l Parks Conservation Ass'n v. EPA***, 759 F.3d 969, 971 (8th Cir. 2014) (discussing how a RAVI determination is made).

As noted, based on EPA's modeling, the Transport Rule results in less visibility improvement than source-specific BART at two of the affected Class I areas,

Badlands and Wind Cave National Parks. However, in rejecting a scrubber as a geographic enhancement, EPA explained that the "primary purpose of EPA's existing regulatory language regarding geographic enhancements . . . is to allow a market-based system to accommodate actions taken under the RAVI provisions. No RAVI finding has been certified [for the Station]." **77 Fed. Reg.** at 40,164.

Although EPA could require a geographic enhancement without a RAVI determination, EPA chose "not to pursue any geographic enhancements" because "EPA has met the minimum requirements for SO$_2$ BART for [the Station] by relying on the Transport Rule." *Id.* "EPA steps into the State's shoes, and must meet the same requirements," with the same "flexibility to make technical judgments within the bounds of the rule." *Id.* Nebraska's plan concluded that no SO$_2$ controls were needed for the Station, rejecting scrubbers as source-specific BART. EPA was tasked with evaluating that action. It concluded Nebraska's decision was unreasoned because scrubbers were a cost-effective option. The Transport Rule, at that point, was not an option. However, when promulgating its plan, EPA did have the option of choosing between source-specific BART or the Transport Rule. *See* **40 C.F.R. § 51.308(e)(4)** ("A State subject to [the Transport Rule] . . . need not require BART"). EPA chose to rely on the Transport Rule, rejecting a geographic enhancement due to the Station's lack of a RAVI certification and finding that the Transport Rule "met the minimum requirements for SO$_2$ BART." **77 Fed. Reg.** at 40,164. Because this court finds EPA properly relied on the Transport Rule for the Station, EPA did not abuse its discretion in rejecting a geographic enhancement.

\* \* \* \* \* \* \*

The petitions for review are denied.

-14-

BYE, Circuit Judge, concurring in the result.

   I agree with all aspects of the Court's opinion, with one exception. In their separate petition for review, the conservation organizations contend in part that the Transport Rule is *not* better than source-specific BART with respect to the Environmental Protection Agency's partial federal plan for Nebraska. To that extent, I do not believe we have jurisdiction over the conservation organizations' petition for review. See Nat'l Parks Conservation Ass'n v. McCarthy, __ F.3d. __, __ (8th Cir. 2016) (2016 WL 240768 at *7) (Bye, J., concurring); see also Nat'l Parks Conservation Ass'n v. United States Envtl. Prot. Agency, 803 F.3d 151, 160 (3d Cir. 2015) (denying a similar petition for review for lack of jurisdiction to the extent it challenged the nationally-applicable determination that the Transport Rule is better than BART).

_____